Gary E. ERVIN, Timothy W. Ervin, and Robert W. Ervin, Appellants,

v.

MANN FRANKFORT STEIN & LIPP CPAS, L.L.P., Appellee.

No. 04–06–00438–CV.

Court of Appeals of Texas, San Antonio.

Aug. 8, 2007.

Kenneth H. Holt, The Holt Law Firm, Thomas P. Carnes, Carnes Ely L.L.P., Houston, for appellants.

Laura B. Herring, Warren W. Harris, Bracewell & Patterson, L.L.P., Houston, for appellee.

Sitting: CATHERINE STONE, Justice KAREN ANGELINI, Justice STEVEN C. HILBIG, Justice.

### OPINION

Opinion by STEVEN C. HILBIG, Justice.

Gary E. Ervin, Timothy W. Ervin, and Robert W. Ervin ("the Ervins") brought claims for negligent misrepresentation and professional negligence against Mann Frankfort Stein & Lipp CPAs, L.L.P. ("MFSL"), an accounting firm. MFSL filed a motion for summary judgment, which was granted. The Ervins appeal raising three issues. We reverse and remand on both claims.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1976, Richard Powers and Robert Guillerman founded South Texas Wholesale Records and Tapes, Inc. ("South Texas"). South Texas was engaged in two lines of business: (1) the "exclusive distri-

bution" business that sold music of independent artists who recorded exclusively for South Texas; and (2) the "one-stop" business that acted as a wholesaler selling music from major record labels to retail outlets. When the business began, Powers was the majority shareholder and president of South Texas. He oversaw general operations of South Texas in San Antonio. Guillerman, a 15% shareholder and vice-president of the corporation, ran the "exclusive distribution business," operated from Houston, Texas.

In 2000, Powers allegedly began exploiting the return policy offered by suppliers. Certain suppliers suspended the company's right to return merchandise and imposed other penalties. One major supplier ultimately refused to allow South Texas to return merchandise until Powers left the company. Given these circumstances, Guillerman decided to purchase[1] South Texas, began looking for investors, and approached his cousin, Gary Ervin. Gary consulted with his brothers and business partners, Robert and Timothy Ervin, and they began to consider participating in a buy out transaction.

In conducting due diligence prior to the buy out, Guillerman and the Ervins engaged an investment banking firm, which was led by Cary Grossman. Grossman recommended they engage a particular law firm and management consulting firm. Those firms were hired. Jay Bowman, a former colleague of Grossman, was in charge of the project for the management consulting firm. Grossman also recommended MFSL to perform certain accounting services.[2]

MFSL's retention was confirmed by an engagement letter dated July 19, 2001. The letter was composed by MFSL and sent to Guillerman as "Shareholder" of South Texas. When Guillerman signed the letter, his signature appears on a line above the printed words "Robert Guillerman" and "Shareholder." The letter provided MFSL was to perform: (1) an audit of South Texas's balance sheet as of August 31, 2001; and (2) certain "agreed upon procedures" and issue a report relating thereto. This second undertaking was further clarified in another engagement letter dated August 8, 2001, in which MFSL agreed to perform certain "agreed-upon procedures" to assist South Texas with certain financing objectives and prepare a report, the "Agreed–Upon Procedures Report." The second letter was also addressed to Guillerman as "Shareholder" and was signed by him noting his approval and agreement to the terms stated therein. This letter, however, does not indicate the capacity in which Guillerman was acting when he signed the document.

In November 2001, the sale of South Texas was accomplished through a Recapitalization Agreement. Guillerman became the majority shareholder and the Ervins and some of the investment bankers became minority shareholders. After the sale, the "new" South Texas unexpectedly began to expend large sums of cash. According to the Ervins, this cash consumption was the result of an undisclosed $5 million liability in the independent artist division.[3] The Ervins contend MFSL

---

1. The parties referred to the purchase as a "buy out." We will adopt and use this term in our opinion.

2. MFSL was used for accounting purposes relating to the buy out rather than South Texas's long-time accounting firm, Sagebiel, Ravenburg & Schuh, P.C. According to Gary

Ervin, MFSL was chosen to avoid any perceived conflict with regard to the due diligence work and because MFSL was a larger firm that came highly recommended.

3. The Ervins contend the undisclosed liability resulted from South Texas apparently netting

failed to discover this alleged impropriety and report it to the investors, resulting in the loss of the Ervins' $3.6 million investment.

According to the Ervins, the problems at South Texas were structural and permanent causing a continued cash drain that could not be solved despite their $3.6 million investment. The continued cash drain prompted Bowman to independently investigate the company's financial records and he discovered the hidden $5 million account payable. The Ervins assert the undisclosed account payable ultimately resulted in the demise of South Texas.

After the business failed, the Ervins brought suit against numerous people and entities including MFSL. As to MFSL, the Ervins alleged negligent misrepresentation and professional negligence. MFSL filed a motion for summary judgment, which the trial court granted. The Ervins perfected this appeal.

## STANDARD OF REVIEW

MFSL filed both traditional and no evidence motions for summary judgment. *See* TEX.R. CIV. P. 166a(c), (i). More specifically, as to the negligent misrepresentation claim, MFSL asserted a traditional motion as to the standing issue, a traditional and no evidence motion as to the element of actual reliance, and a no evidence motion as to whether reliance was justified. Only a traditional summary judgment was filed as to the claim of professional negligence.

The standards of review for both traditional and no evidence motions are well-established. Courts review traditional and no evidence motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). A traditional motion for summary judgment

is granted only when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law on the grounds expressly set forth in the motion. *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex.2005). When reviewing an order granting a traditional motion for summary judgment, courts take evidence favorable to nonmovant as true and indulge every reasonable inference from the evidence in favor of the nonmovant. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). A no evidence motion for summary judgment should be granted if the non-movant fails to present more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

## DISCUSSION

### *Negligent Misrepresentation*

#### *Standing*

The Ervins contend in their first issue the trial court erred in granting MFSL's motion for summary judgment on the claim of negligent misrepresentation based upon an alleged lack of standing. The Ervins argue they are entitled to pursue a negligent misrepresentation claim against MFSL based on section 552 of the Restatement (Second) of Torts. While MFSL agrees section 552 controls, it argues the Ervins do not meet the criteria set forth therein regarding standing.

 A negligent misrepresentation claim is not the equivalent of a professional malpractice or negligence claim. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex.1999). Unlike a professional malpractice or negligence claim, liability is not

unrelated account payables against receiv- ables.

based on a breach of duty a professional owes a client or others in privity. *Id.* Rather, liability is based on the professional's "manifest awareness" of the non-client's reliance and the professional's intention that the non-client rely on the professional's representations. *Id.* Thus, an accountant can be subject to a negligent misrepresentation claim when he is not subject to a professional negligence claim. *See id.* (applying rule to attorney-client relationship). Accordingly, in determining whether a claim for negligent misrepresentation is viable against a professional, we look not to rules governing the existence of privity; rather, we look to section 552 of the Restatement (Second) of Torts which provides, in pertinent part: [4]

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>> (b) through reliance upon it in a transaction that he intends the infor-

mation to influence or knows that the recipient so intends or in a substantially similar transaction.

RESTATEMENT (SECOND) OF TORTS § 552(1), (2) (1977).

■ In *McCamish*, the supreme court held liability under section 552(2) is limited to situations in which a professional is aware of the non-client and intends for him to rely on the information with regard to a certain transaction. *Id.* at 794. In other words, standing exists when the professional has knowledge of the identity of the party to whom the information is provided and actual knowledge of the purpose for which the information is being supplied. *See id.*

■ According to the commentary to the Restatement, there is standing to assert a misrepresentation claim under section 552 when the information user is either the person for whose benefit the professional supplied it, or "one of a limited group of persons" for whose benefit it was supplied. RESTATEMENT (SECOND) OF TORTS § 552 cmt. a (1977). Direct communication by the professional to the user is not required to establish standing. *Id.* cmt. g. Nor is it necessary that the professional have "any particular person in mind as the intended, or even probable, recipient." *Id.* cmt. h. In other words, the potential plaintiff does not have to be specifically identified or even known to the defendant when the information is supplied. *Id.* Rather, it is sufficient if:

> ... the maker supplies the information for repetition to a certain group

---

4. Section 552 has long been the standard in Texas by which negligent misrepresentation claims against accountants have been judged. *See, e.g., Brown v. KPMG Peat Marwick,* 856 S.W.2d 742, 748 n. 7 (Tex.App.-El Paso 1993, writ denied); *Shatterproof Glass Corp. v. James,* 466 S.W.2d 873, 880 (Tex.Civ.App.-Fort Worth 1971, writ ref'd n.r.e.) (applied

tentative draft of section 552, which contains same wording as present version, and recommended adoption of same in Texas). In 1991, the Texas Supreme Court adopted section 552. *McCamish,* 991 S.W.2d at 791 (citing *Fed. Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991)).

or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.

*Id.*

■ In its motion for summary judgment, MFSL alleged it was unaware of the Ervins and therefore could not have intended to provide any information for their reliance. The Ervins argue they have standing because they were part of a limited group of persons for whose benefit the information was supplied or MFSL knew the actual recipient intended to supply the information to the Ervins. We agree there is some evidence to support the Ervins' position.

MFSL argues it produced evidence in its motion supporting its claim that MFSL had no actual knowledge of the Ervins or their participation in the purchase of South Texas. Tom Elder, MFSL's partner in charge of the project, testified MFSL was hired to assist South Texas "with certain financing objectives." However, the evidence in the record suggests the only "financing objectives" MFSL was even aware of were those involving the Recapitalization Transaction for the buy out of South Texas. Christine Woods, MFSL's senior accountant on the project, admitted MFSL's services were for the purpose of the Recapitalization Transaction.

The evidence produced by the Ervins shows MFSL received an e-mail from Grossman, the project leader for the management consulting firm, which included a copy of the "Working Group List." That list identified the persons or entities involved in the Recapitalization Transaction and divided them into a "Buyer Group" and "Sellers." Included in the Buyer Group are MFSL and Ervin Cable Construction, Inc., which at the time was owned by the Ervins. Ervin Cable Con-

struction, Inc. was identified as a Private Equity Investor and Gary Ervin was identified as its president. This evidence, when all reasonable inferences from it are indulged in favor of the Ervins, is some evidence MFSL knew the Ervins were part of a "limited group" for whose benefit MFSL was supplying its information. Even if this were not true, the summary judgment evidence produced by the Ervins at least suggests MFSL knew it was providing information to, and did provide information to, Guillerman and Grossman who were members of the Buyer Group and could reasonably be expected to pass the information onto other members of the Buyer Group, including the Ervins. In fact, when MFSL completed its Agreed–Upon Procedures Report, it sent one copy of the report to Guillerman and nine copies to Grossman. The actions of MFSL in providing multiple copies of the report may also be construed as some evidence it intended its work to be shared with the Buyer Group.

The summary judgment evidence produced by the Ervins also includes numerous e-mails from Grossman or Bowman to Elder that, on the face of the e-mails, were sent to members of the Buyer Group, including Gary Ervin and his attorney. The e-mails are some evidence MFSL knew there were identifiable individuals in a limited group to whom its information was being supplied, if not by MFSL, then by the actual recipients-Guillerman and Grossman.

MFSL's evidence in support of its motion for summary judgment fails to address, much less overcome, the Ervins' evidence that they were part of a limited group of persons for whose benefit and guidance MFSL intended to supply the information or whether MFSL knew the actual recipients of its work product (Guillerman and Grossman) were likely to sup-

ply MFSL's work product to a limited group of individuals.[5] Thus, MFSL's summary judgment cannot stand. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339 (Tex.1993) (holding specific grounds for motion for summary judgment must be stated in motion and if not so stated motion is legally insufficient as a matter of law).

■ MFSL argues that even if the Ervins were part of a limited group that MFSL knew would receive and rely on its work product, the Ervins cannot bring misrepresentation claims because (1) in the August engagement letter, MFSL limited the use of its work product to South Texas, and (2) MFSL was unaware of the specific transaction for which the Ervins intended to use its information, and thus, was not aware of the purpose for which it was supplying the information as required by section 552(2)(b). These grounds are not stated in MFSL's motion for summary judgment and therefore cannot support the granting of the motion. *See McConnell*, 858 S.W.2d at 339.

However, even if it were possible to construe MFSL's motion to include these grounds, it is still not entitled to summary judgment. MFSL argues the explicit terms of the August engagement letter specify its work was intended solely for South Texas. We disagree. The August engagement letter states in pertinent part:

This engagement and the resulting report is intended solely for the information and use of South Texas Wholesale Records and Tapes, Inc. and should not be used by those **who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.**[6]

(emphasis added). This letter clearly envisions reliance by others who have "agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes." The summary judgment evidence, when viewed in the light most favorable to the Ervins, clearly includes the Ervins as those who agreed to the procedures contemplated by the report and intended to use the report for purposes of investing, among other things. Additionally, given MFSL's acknowledgment that it was aware of the purpose of its work (accomplishment of financing objectives to effect the Recapitalization Transaction) and its knowledge of the

---

**5.** In its brief, MFSL attempts, for the first time, to address the "limited group" issue. Even if MFSL had presented the issue in its motion for summary judgment, the case upon which it relies does not support its contention. In *Tara Capital Partners I, L.P. v. Deloitte & Touche, L.L.P.*, the court held the plaintiffs did not have standing to bring a negligent misrepresentation claims because they were "indistinguishable from any other potential open market buyers." No. 05–03–00746–CV, 2004 WL 1119947, *3 (Tex.App.-Dallas May 20, 2004, pet. denied) (mem.op.). The court specifically noted there was no dispute that the accounting firm had no knowledge of the identity of the plaintiffs and knew nothing about their contemplated stock purchase—they were merely unknown market buyers. *Id.* Moreover, there was nothing to suggest the accounting firm knew the party for whom it performed the audit would utilize the audit to attract investors like the plaintiffs. *Id. Tara Capital* is clearly distinguishable. This case does not involve a stock sale to unknown open market buyers. It is certainly disputed as to whether MFSL had knowledge of the Ervins—and in fact there is summary judgment evidence to suggest it did. Further, in this case there is evidence MFSL knew its information was being used for the Recapitalization Transaction—a transaction it knew would involve financing by banks and other known investors.

**6.** The "procedures" referred to in the letter are the procedures MFSL was engaged to perform. A full listing of the procedures to be performed was attached to the letter and include work relating to accounts receivable and inventory.

members of the Buyer Group (including the Ervins), there is some evidence, despite the referenced disclaimer, that MFSL knew its work would be distributed to, used, and relied upon by others beyond Guillerman and current South Texas management.

MFSL's contention that, for the Ervins to have standing to sue, MFSL had to know the specific details of the transaction for which the Ervins intended to use the information also fails. Section 552(2)(b) requires simply that the person or entity providing the information have knowledge about the transaction, or a substantially similar transaction, for which the information is being used. RESTATEMENT (SECOND) OF TORTS § 552(2)(b) (1977). MFSL's interpretation would delete the phrase "substantially similar." In this case, the evidence shows, or at least raises a fact issue, that MFSL knew it was hired for the Recapitalization Transaction, knew the purpose of the transaction, and knew the Ervins were involved as investors. There is no authority to suggest that MFSL had to know the specific details of how the transaction was to be consummated.

In any event, there is summary judgment evidence indicating MFSL actually knew the Ervins intended to use the information to accomplish the buy out of South Texas through the Recapitalization Transaction. The Ervins produced evidence suggesting MFSL knew it was hired to determine the financial condition of South Texas to permit the Buyer Group to evaluate the financial efficacy of the transaction. Clearly, the financial condition of the company was a major issue and potential investors will rely upon information provided by the accountants hired for this purpose.

MFSL's argument also appears to be based partly on a belief that the Ervins' complaints are limited to misrepresentations contained in the audit report. This limited focus is misplaced. The Ervins' misrepresentation claims are not based solely on representations contained in the audit report. The Ervins' fourth amended petition was the live pleading at the time the motion for summary judgment was filed. The record does not contain any special exceptions, much less any rulings on exceptions, to this petition. Therefore, the petition must be construed liberally in favor of the Ervins. See Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 897 (Tex.2000); Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex.1993). Construing the Ervins' petition liberally, it is clear the claims are based upon representations in an e-mail and in the Agreed Upon Procedures Report as well as the audit report. Thus, any attempt by MFSL to limit the misrepresentation claims to the audit report are without merit and negate its entitlement to summary judgment. See McConnell, 858 S.W.2d at 339.

For the reasons set forth above, we sustain issue one.

### Reliance

In issue two, the Ervins contend summary judgment was improper because the summary judgment evidence raised a genuine issue of fact as to reliance. The parties agree that for the Ervins to recover on negligent misrepresentation claims, they have to prove their reliance was justified. See Sloane, 825 S.W.2d at 442 (Tex. 1991); RESTATEMENT (SECOND) OF TORTS § 552(1) (1977). Justifiable reliance is known as the "materiality" element of misrepresentation and is composed of two sub-elements: actual reliance and reasonable reliance. Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc., 88 F.3d 347, 358 (5th Cir.1996) (applying Texas law), cert. denied, 519 U.S. 1078, 117 S.Ct. 740, 136 L.Ed.2d 679 (1997).

## Actual Reliance

■ As to actual reliance, MFSL appears to have urged both a traditional and a no evidence motion for summary judgment. *See* TEX.R. CIV. P. 166a(c), (i). The Ervins contend the motion for summary judgment only addresses reliance on the audit report. We disagree. On pages 15–16 of the motion, MFSL asserts the Ervins cannot raise a fact issue as to their reliance "on MFSL's audit of the South Texas balance sheet **or any other representation by MFSL.**" (emphasis added). Because the Ervins did not file special exceptions, we will construe the motion as covering all representations and determine whether there is a genuine issue of material fact. *See McConnell,* 858 S.W.2d at 342.

In the motion and in its brief, MFSL argues the Ervins could not have relied upon any representations in the audit report in making their investment decisions because the audit report was issued in April 2002—months after the Recapitalization Transaction closed in November 2001. However, the summary judgment evidence produced by the Ervins shows they loaned an additional $1.6 million to South Texas after the audit report was issued. Gary Ervin signed a guaranty for an additional $1 million after the report was issued. The reasonable inference from Gary Ervin's deposition testimony with regard to this subsequent investment of capital is that the Ervins continued to commit money to South Texas because there was nothing in the audit report that suggested the company was suffering from any significant financial problems. Thus, there is a fact issue as to whether the Ervins actually relied upon the audit report.

MFSL claims it did not know about the subsequent loans or the guaranty, and thus, relying on *Tara Capital,* is entitled to judgment. *See Tara Capital,* 2004 WL 1119947, at *3. This argument merely recasts MFSL's previous argument, which we have already rejected, that it was required to know the exact purpose and/or the specific transaction for which the information was being provided. As noted above, the evidence produced by the Ervins and the reasonable inferences from that evidence establish MFSL knew about the specific transaction and that a known group of investors would be investing and making other financial decisions based on its work. This knowledge is sufficient. *See* RESTATEMENT (SECOND) OF TORTS § 552(1), (2) (1977).

The Ervins assert the audit report is not the only document containing misrepresentations upon which they relied. They contend they relied upon an e-mail Elder sent to Bowman about the near completion of the fieldwork for the audit report and the Agreed Upon Procedures Report, which inferentially suggested no problems had been found.[7] MFSL's argument on this issue is essentially the same as that set forth directly above: MFSL did not know about the Ervins and were unaware of the transactions for which they intended to rely upon MFSL's work. MFSL is incorrect. As detailed above, there is evidence that at least raises a fact issue as to MFSL's knowledge of the Ervins and knowledge of the transaction for which it was providing information and making representations.

---

7. The e-mail to Bowman states: "within 2 weeks, we could have [audit] report issued, assuming we have all information requested. Please let me know if you want us to suspend work so I can relay to troops......Company would save a little money but **clearly the majority of work is done, including the rough drafting of the report with footnotes.**" (emphasis added).

Given all of this, reasonable and fair-minded people could at least differ in concluding whether the Ervins actually relied on MFSL's representations and work product in deciding whether to participate in the Recapitalization Transaction or continue capitalizing the business after the purchase of South Texas was completed.

### Justifiable Reliance

■■ MFSL brought a no evidence motion for summary judgment challenging the reasonableness of the Ervins' reliance. *See* TEX.R. CIV. P. 166a(i). In response, the Ervins provided evidence showing: (1) MFSL's knowledge that its work would be used to determine the efficacy of the Recapitalization Transaction; (2) MFSL's knowledge of the existence and membership of the Buyer Group, which included the Ervins; and (3) members of the Buyer Group not Powers, the president of South Texas, directed MFSL's work. Moreover, evidence produced by the Ervins shows Elder admitted in his deposition that it was reasonable for the Ervins to rely on the audit report.

In light of the record, there is at least a fact issue as to whether the Ervins' reliance on MFSL's representations and work product was reasonable. Based upon the foregoing, we sustain the Ervins' second issue.

### Professional Negligence

The Ervins contend in issue three the trial court erred in granting MFSL's motion for summary judgment on the professional negligence claim because they have standing to bring suit against MFSL. The Ervins argue they are entitled to pursue their professional negligence claim against MFSL because the evidence raises a material fact issue regarding the existence of an accountant-client relationship between them and MFSL.

■■■ A professional negligence claim requires privity of contract. *Prospect High Income Fund v. Grant Thornton, LLP,* 203 S.W.3d 602, 609 (Tex.App.-Dallas 2006, pet. filed January 18, 2007) (petition filed on other grounds); *see McCamish,* 991 S.W.2d at 792. Privity is the contractual connection or relationship that exists between two or more parties. *See Wright v. Gundersen,* 956 S.W.2d 43, 48 (Tex.App.-Houston [14th Dist.] 1996, no writ) (discussing privity in context of attorney-client relationship). The accountant-client relationship is a contractual relationship that creates privity between the accountant and the client, permitting only the client to bring a claim for professional negligence against the accountant. *See Prospect High Income,* 203 S.W.3d at 609. The contract between the parties that creates the relationship may be express or implied. *See Burnap v. Linnartz,* 914 S.W.2d 142, 148 (Tex.App.-San Antonio 1995, writ denied) (holding attorney-client relationship may be implied from conduct of parties).[8]

■■■ Whether an implied contract exists is determined from the actions of the parties. *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972). An im-

---

8. Because attorneys and accountants are professionals generally governed by the same standard of care and both relationships require privity for a client to pursue a claim for professional negligence, it is logical in this case for the court to refer to, and rely upon, cases involving the creation of an attorney-client relationship—particularly given the absence of such authority in the context of the accountant-client relationship. *See Univ. Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 710 (Tex.App.-San Antonio 1989, no writ) (holding that generally standard of care applicable to accountant is same as standard applicable to attorneys, doctors, and other professionals).

plied contract exists when the facts and circumstances show a mutual intention to contract, i.e., a meeting of the minds. *Id.* The determination of whether there is a meeting of the minds must be based upon objective standards of the parties' actions, not on their alleged subjective states of mind. *Roberts v. Healey,* 991 S.W.2d 873, 880 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

■ The Ervins concede there was no express agreement between themselves and MFSL and they agree the summary judgment evidence produced by MFSL negates the existence of an *express* agreement. They argue, however, MFSL's evidence fails to negate the existence of an *implied* agreement and that they produced substantial evidence of an implied agreement. MFSL contends the evidence proves as a matter of law that South Texas was its client-not potential South Texas investors like the Ervins.

In support of its motion for summary judgment, MFSL relies upon (1) the July engagement letter, (2) the August engagement letter, (3) Gary's deposition testimony, (4) Timothy's deposition testimony, (5) Robert's deposition testimony, and (6) the Ervins' responses to requests for admissions. Given the Ervins' concession that no express agreement existed, the question is whether this evidence conclusively established the absence of any implied agreement between the Ervins and MFSL. Of the evidence relied upon by MFSL, we find that only the Ervins' deposition testimony negates the existence of an implied agreement. The other evidence relied upon by MFSL either fails to address the existence of an implied agreement (responses to requests for admissions) or creates a fact issue (the engagement letters). The July letter was a proposed engagement letter from MFSL and was addressed to Guillerman as "Shareholder" of

South Texas rather than as vice-president of the corporation. The letter was not copied to Powers, the president of South Texas. By its terms, the purpose of the letter was "to provide our [MFSL] understanding of the engagement to provide services to South Texas Wholesale Records and Tapes, Inc." The letter did not mention the provision of services to any other person or entity. Only Guillerman signed the letter. The August letter was also addressed to Guillerman as "Shareholder" with no copy to Powers. As the previous letter, the August letter was signed solely by Guillerman.

Neither letter suggests an **express** agreement between MFSL and any other person or entity beyond South Texas. However, we disagree with MFSL's position that the letters prohibit the possible existence of an implied contract between MFSL and the Ervins. As discussed above, the emphasized portion of the August letter specifically contemplates use of MFSL's work product by others thereby implying an agreement between MFSL and others beyond South Texas.

Moreover, the Ervins contend the record contains additional evidence showing MFSL impliedly agreed to provide accounting services to the Ervins thus creating a fact issue precluding summary judgment on the professional negligence claim. The Ervins contend MFSL's knowledge that it was hired for the purpose of the Recapitalization Transaction (the buy out of South Texas by Guillerman and other investors), it was providing services to facilitate the transaction on behalf of the members of the Buyer Group, and the Ervins were members of the Buyer Group, is evidence of an implied agreement to provide accounting services to the members of the Buyer Group including the Ervins. We find this argument meritorious.

During his deposition, Elder testified MFSL was hired to assist South Texas "with certain financing objectives." While he adamantly refused to directly acknowledge a relationship between MFSL and anyone other than South Texas, reasonable inferences from his testimony and other the evidence establishes the only "financing objectives" were those involving the Recapitalization Transaction for the buy out of South Texas. Additionally, Woods, MFSL's senior accountant on the project, testified MFSL understood that its services were necessary for the Recapitalization Transaction to happen. Viewing this evidence in a light favorable to the Ervins, and indulging all reasonable inferences therefrom in their favor, there is some evidence MFSL knew it was hired for the purpose of facilitating the Recapitalization Transaction.

On July 19, 2001—the same date as the first engagement letter—Grossman sent an e-mail to several people including Elder of MFSL with a copy of the Working Group List attached to the message. As previously noted, that group included the Ervins. This fact, coupled with the admissions of Elder and Woods with regard to MFSL's knowledge of the purpose of its work, is certainly some evidence of an implied agreement. It is some evidence that MFSL knew and accepted that the Buyer Group and its members were the actual clients rather than South Texas. This conclusion is further established by MFSL's total disregard of Powers. At the time MFSL was hired until the Recapitalization Transaction closed, Powers was president of South Texas and his family owned eighty-five percent of the stock. Yet, MFSL directed the engagement letters to Guillerman not Powers. If South Texas had hired MFSL, it is reasonable to assume the engagement letters would have been between its president and MFSL or at least with Guillerman in his capacity as

the corporation's officer and not in his capacity as a shareholder. This argument is particularly persuasive given the evidence showing Powers, not Guillerman, was responsible for overseeing South Texas's general operations. Additionally, as shown by the following e-mail message, MFSL declined to even discuss the release date of the audit report with Powers without prior permission from Bowman, the consultant in the Buyer Group:

——Original Message——

From: Tom Elder

To: *jay.bowman@tatumcfo.com*

Sent: 10/2/01 7:39 PM

Subject: RE: audit status

okay.....Robert should be fine on rep letter.........Richard [Powers] left me a voice mail stating he needs to know when we anticipate issuing our audit report..... **I wanted to check with you before I returned his call to make sure I am not telling him something I shouldn't?**

(emphasis added). If South Texas was truly MFSL's client, it appears illogical that Elder would seek permission from a member of the Buyer Group before speaking with Powers, the reigning president of South Texas, about the status of MFSL's work. Moreover, when MFSL completed its Agreed–Upon–Procedures–Report, it did not send the report to Powers. Instead, MFSL sent one copy of the report to Guillerman and nine copies to Grossman. The actions of MFSL in providing multiple copies of the report may also be construed as some evidence it intended its work for the benefit of persons other than South Texas.

The summary judgment evidence produced by the Ervins also includes numerous e-mails from Bowman and Grossman to Elder that were copied to members of the Buyer Group, including Gary Ervin

and sometimes his attorney, but not to Powers. These e-mails include the working group list, the status of MFSL's field work, and status of reports. MFSL is clearly discussing its services with members of the Buyer Group. Indulging all reasonable inferences from these e-mails in favor of the Ervins, they constitute some evidence that MFSL had impliedly agreed to provide services to members of the Buyer Group, including the Ervins.

Finally, the Ervins' summary judgment evidence includes copies of checks for payment of MFSL's services. These checks were drawn on an account in the name of Guillerman from a Kentucky bank and signed by Charles McElroy, the controller for Ervin Cable Construction, Inc. Though payment of fees is not definitive with regard to the creation of an accountant-client relationship, it is some evidence that such a relationship might exist when reasonable inferences from the payment are indulged in favor of the Ervins. *See Roberts,* 991 S.W.2d at 881 (holding no attorney-client relationship necessarily arises based on payment of fees).

Viewing the evidence in the light most favorable to the Ervins, there is at least a fact issue concerning the implied creation of a professional relationship between MFSL and the Ervins that precludes summary judgment. Therefore, we sustain the Ervins' third issue.

## CONCLUSION

Based upon our analysis of the evidence, we sustain the Ervins' issues. Accordingly, we reverse the trial court's judgment on both the negligent misrepresentation and professional malpractice claims and remand to that court for further proceedings consistent with our opinion.