

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-21-00163-CV
_____

INTERNATIONAL BANK OF COMMERCE–OKLAHOMA, APPELLANT

V.

LANE GORMAN TRUBITT, LLC, COLLIN KANELAKOS,
AND PATRICK REILLY, APPELLEES

On Appeal from the 99th District Court
Lubbock County, Texas
Trial Court No. 2019-535,971; Honorable Mackey K. Hancock, Presiding by Assignment

August 3, 2022

## MEMORANDUM OPINION

Before QUINN, C.J. and PARKER, J. and PIRTLE, S.J.[1]

This is an appeal from a summary judgment entered in favor of Appellees, Lane Gorman Trubitt, LLC, a professional accounting limited liability corporation, Collin Kanelakos, and Patrick Reilly, (hereinafter collectively "LGT"), in a third-party negligent

---

[1] Senior Justice Patrick A. Pirtle, retired, sitting by assignment. TEX. GOV'T CODE ANN. § 75.002(a)(1).

1

misrepresentation and fraud claim, arising out of the financial collapse of Reagor-Dykes Auto Group (hereinafter "Reagor-Dykes"). In the underlying lawsuit, Appellant, International Bank of Commerce-Oklahoma (hereinafter "IBC"), sued LGT for negligent misrepresentation and fraud for failing to discover and disclose certain financial irregularities in its 2015 and 2016 audits of Reagor-Dykes. After an appropriate time for discovery, LGT filed a consolidated traditional and no-evidence motion for summary judgment. A hearing was held on May 25, 2021, at which time the trial court took the matter under advisement. Without specifying which motion or ground relied upon, the assigned judge later granted summary judgment on June 21, 2021, as to all parties and causes of action. Appellant timely filed notice of appeal. IBC contends the trial court erred by granting each motion as to each audit. In response, LGT contends the trial court did not err and that there is sufficient summary judgment evidence upon which the trial court could and did properly grant summary judgment. Agreeing with LGT, we affirm.

### BACKGROUND

Reagor-Dykes was a business entity operating multiple automobile dealerships and related entities in and around the Lubbock area. As is typical with automobile dealerships, Reagor-Dykes would "floor-plan" its inventory. Floor-plan financing is a form of retail financing for large ticket items, such as automobiles, displayed on showroom floors or dealer lots. Under a floor-plan arrangement, the lender provides a short-term loan to the retailer to purchase inventory items. The lender is then repaid as the items are sold. In general, floor-plan financing is an asset-backed, revolving line of credit made for the purpose of allowing a retail operator to finance the purchase of large ticket inventory items, where the inventory also serves as collateral for the loan if the business

2

does not sell its inventory and cannot repay the loan. A floor-plan loan agreement typically calls for the periodic repayment of the loan as inventory is sold. The sale of inventory without making these required payments is referred to as selling inventory "out-of-trust."

Since 2008, the majority of Reagor-Dykes's floor-plan financing was done through Ford Motor Credit Corporation (hereinafter "FMCC"). Under its floor-plan arrangement with FMCC, Reagor-Dykes would purchase new inventory from Ford Motors and FMCC would take a security interest in the inventory purchased. Under the terms of the financing agreement, whenever Reagor-Dykes sold a vehicle, it had seven days to repay FMCC. To ensure that vehicles were not sold out-of-trust, FMCC would conduct periodic "surprise" audits. In order to conduct these audits, FMCC employed the services of Alliance Inspection Management, LLC (hereinafter "AIM"). From 2008 until 2017, business appeared prosperous for Reagor-Dykes. In the spring of 2017, that picture started to change.

Less than two years earlier, in the summer of 2015, Reagor-Dykes engaged LGT to perform an audit of its consolidated balance sheet as of December 31, 2015. The engagement letter specifically provided that income and cash flow statements would be compiled but not audited. Moreover, the letter agreement provided that Reagor-Dykes would not produce LGT's audit report to any third party without prior authorization.

In March 2016, LGT began working on its audit. During the course of that audit, LGT obtained various workpapers from Reagor-Dykes that reflected numerous loans and outstanding debts to several banks in and around Lubbock. As a part of the audit process,

Reagor-Dykes officials made multiple representations that they were unaware of any actual or suspected fraud at any of the numerous dealerships during the calendar year ending December 31, 2015. On July 2, 2016, LGT published its consolidated balance sheet audit for the 2015 calendar year.

In December 2015, before the 2015 Audit Report was released, Reagor-Dykes retained LGT to conduct a full audit for the 2016 calendar year. It was during LGT's audit of Reagor-Dykes for purposes of the 2016 Audit Report that Reagor-Dykes entered into a lending relationship with IBC. The 2016 unqualified[2] Audit Report was not released until November 21, 2017. As with the previous 2015 Audit Report, LGT discovered no evidence of fraud at any of the Reagor-Dykes entities during the calendar year ending December 31, 2016.

Subsequent to the 2016 calendar year, but eight months prior to the publication of the 2016 Audit Report, in March 2017, AIM's inventory audit revealed that Reagor-Dykes had made over $25 million in out-of-trust sales. As a result, the principals, Bart Reagor and Rick Dykes, were required to inject $25 million in capital into Reagor-Dykes in order to cure this default. Compounding their troubles, around this time, Reagor-Dykes's CFO, Shane Smith, began kiting checks to help cover the deficits created by the need to pay back such a large sum to FMCC. During this same time frame, Smith and the accounting staff at Reagor-Dykes also submitted vehicle identification numbers on vehicles already sold as collateral for additional financing.

---

[2] An "unqualified" audit is an independent auditor's judgment that a company's financial statements are fairly and accurately presented, without any identifiable exception in compliance with Generally Accepted Accounting Principles ("GAAP").

4

After the $25 million cash call in March 2017, Reagor-Dykes began discussions with IBC with the objective of obtaining additional capital. Reagor-Dykes, acting through its real estate entity, RD7 Investments, LLC, applied for a $10 million unsecured loan (the "Blue Sky Loan") and a $29.8 million (later reduced to $25 million) loan secured by Reagor-Dyke's real estate (the "Real Estate Refinance Loan"). Both loans were guaranteed by the dealerships and the owners, Bart Reagor and Rick Dykes. Despite its relevance to the transaction, IBC was not informed about the AIM audit revealing the out-of-trust sales.

What information IBC did receive was (1) non-audited, company-prepared financials for 2014, 2015, and 2016, (2) dealership tax returns, (3) a debt schedule, (4) a real estate collateral summary, (5) personal financial statements and tax returns for Bart Reagor and Rick Dykes, (6) a non-audited internal water report dated April 1, 2017, (7) FMCC's December 20, 2016 floor-plan Audit Summary Report (the floor-plan audit conducted prior to the discovery of any out-of-trust sales), and (8) LGT's 2015 Audit Report of Reagor-Dykes's consolidated balance sheet.[3] Based on this information, IBC prepared an eighty-three-page commercial loan memorandum for submission to its loan committee, executive committee, and board of directors for consideration and approval.

The loan memorandum analyzed three primary factors: (1) the ability of Reagor-Dykes to repay the loan, (2) the financial resources of the guarantors, and (3) the nature and extent of collateral that could be liquidated in the event of default. In its analysis of the ability of Reagor-Dykes to repay the loan, IBC prepared a "Global Cash Flow and

_____

[3] Despite the agreement that the Audit Report would not be provided to any third party without prior authorization, Reagor-Dykes provided the report without LGT's knowledge or consent.

Debt Service Coverage Analysis" using numbers provided exclusively from non-audited, company-prepared financial statements. Regarding the second factor, IBC relied on Reagor's personal unaudited financial statements and tax returns. It also relied on the March 2017 company-prepared, unaudited financial statement of each dealership. Finally, regarding the third factor, the loan memorandum contained IBC's own collateral valuation summary based on an artificially applied appreciation percentage applied to Reagor-Dykes's actual cost basis. The memorandum discussed how the Real Estate Refinance Loan was to be structured and how the loan would be limited to "the lesser of $29.8MM or 80% of appraised value [of the real estate]" as a means of providing a cushion should the values decrease or should IBC incur additional costs associated with foreclosure and liquidation. The loan memorandum also noted that IBC would hire its own appraisers to assess the values of individual parcels of collateral for purposes of this limitation. Even though the 2015 Audit Report was a document provided to IBC by Reagor-Dykes, it did not form a basis of IBC's analysis of these three factors and the memorandum itself provided no analysis of that report. In short, IBC did not rely on financial information audited by LGT in preparing its loan memorandum. Despite the fact that the loan memorandum and its attachments constituted an "in depth" analysis of Reagor-Dykes's financial condition, out of those eighty-three pages, the memorandum contained only three sentences discussing the 2015 Audit Report:

> As a part of the collaborative effort to be able to tap into the capital markets in the coming years, Reagor Auto Group just completed their 1st Audit in 2015. The audit was completed by Lane Gorman Trubitt, LLC. The Lane Gorman Trubitt Dealer Services Group has more than 50 years of experience serving close to 200 dealerships throughout the Southwest.

6

The memorandum concluded with a summary of Reagor-Dykes's strengths and weaknesses as a potential borrower. Based on this memorandum, IBC's loan officer, Will Woodring, concluded that Reagor-Dykes was an acceptable credit risk and he recommended that IBC approve Reagor-Dykes's loan request.

Woodring's recommendation was presented to IBC's executive committee and its board of directors, who subsequently approved both the $10 million Blue Sky Loan and the $29.8 million Real Estate Refinance Loan. Initially, neither loan was contingent on receipt of the 2016 Audit Report, which was yet to be completed. Following approval of the loans, the borrower changed from RD7 Investments, LLC to D&R Acquisitions, LLC, another Reagor-Dykes real estate entity. On July 13, 2017, D&R Acquisitions, LLC finally signed its Loan Agreement with IBC. The Loan Agreement provided for two equal advances of $5 million on the Blue Sky Loan, plus an advance of $29.8 million on the Real Estate Refinance Loan in 180 days. By this time, both loans were subject to various conditions, including a requirement that Reagor-Dykes provide LGT's 2016 Audit Report. Notwithstanding a failure to satisfy this particular condition, IBC funded the first $5 million on the Blue Sky Loan.

On November 21, 2017, LGT issued the 2016 Audit Report and provided it to Reagor-Dykes, who subsequently provided it to IBC. In December 2017, apparently without reviewing the 2016 Audit Report, IBC approved a $2 million increase in the Blue Sky Loan and a $4.8 million decrease in the Real Estate Refinance Loan. Both loans were later fully funded on February 21, 2018. Later that same year, Reagor-Dykes needed additional capital to construct a new dealership showroom. Despite the fact that a new construction loan would increase Reagor-Dykes's debt ratio beyond the regulatory

7

limit, on July 19, 2018, IBC funded a new loan (the "Construction Loan") in the amount of $200,000. Again, no mention was made concerning the 2016 Audit Report.

Repercussions from the March 2017 AIM audit continued to plague Reagor-Dykes and almost a year and a half later, on August 1, 2018, most of the Reagor-Dykes entities filed for Chapter 11 bankruptcy relief. As a result, D&R Acquisitions, LLC defaulted on its loan obligations to IBC. At the time of default, D&R Acquisitions, LLC owed the following principal amounts: (1) $9,378,817 on the Blue Sky Loan, (2) $24,494,137 on the Real Estate Refinance Loan, and (3) $153,000 on the Construction Loan. In addition, various Reagor-Dykes entities were indebted to IBC for over $4 million in overdrawn checks. At that time, LGT withdrew from its arrangement with Reagor-Dykes and a 2017 audit was never completed.

During the bankruptcy proceedings, IBC sought to recover sums due it from various Reagor-Dykes entities. In addition to receiving $521,707 in rent payments from collateral held, it was able to net, through the foreclosure of real estate collateral, the sum of $16,421,000.[4] Thereafter, IBC sought to recover the deficiencies from various entities, including LGT. In April 2020, IBC, Reagor, and the non-bankrupt Reagor-Dykes entities agreed to a judgment in the amount of $23,865,778.48. IBC also non-suited its claims against FMCC and AIM.

IBC continued prosecution of this suit against LGT, maintaining that it was damaged by its reliance on alleged misstatements and omissions contained in the 2015

---

[4] The foreclosure proceeds were approximately thirty percent of the collateral's 2019 appraised value.

Audit Report of the balance sheet-only and the subsequent 2016 Audit Report. According to IBC's theory, it relied on misstatements and omissions in both reports, to its detriment, when it approved loans to the Reagor-Dykes entities. After a period of discovery, in response to those allegations, LGT filed a traditional and no-evidence motion for summary judgment primarily relying on the accusation that IBC did not actually or justifiably rely on the audit reports in making its loan decisions. LGT contends that because the 2015 audit (the only audit available when lending decisions were being made) was limited to the balance sheet-only (and not an analysis of income or cash flow) IBC could not have reasonably relied on any information contained in that audit to make the multi-million dollar loan in question. LGT further contends there is no evidence raising an issue of material fact and that it is entitled to a favorable judgment as a matter of law.

The trial court granted summary judgment in favor of LGT as to each and every cause of action being asserted by IBC. The trial court did not, however, specify the grounds on which summary judgment was granted. By this appeal, IBC raises two basic issues:

(1) Did the trial court err in granting summary judgment (either traditional or no-evidence) on IBC's claims of negligent misrepresentation and fraudulent misrepresentation as to the 2015 Audit Report?

(2) Did the trial court err in granting summary judgment (either traditional or no-evidence) on IBC's claims of negligent misrepresentation and fraudulent misrepresentation as to the 2016 Audit Report?

We conclude the trial court did not err and affirm.

### SUMMARY JUDGMENT

The standards of review for both traditional and no-evidence motions for summary judgment are well-established. An appellate court reviews all motions for summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced by the motion are meritorious. *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 281, n.3 (Tex. 2017).

A party seeking summary judgment can move for both a traditional and no-evidence summary judgment in the same or separate motions. *See* TEX. R. CIV. P. 166a(c), (i); *Binur v. Jacobo*, 135 S.W.3d 646, 650 (Tex. 2004). Further, when a party has filed both a traditional and no-evidence motion for summary judgment, we typically review the no-evidence summary judgment first. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017) (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004)). This is so because, if the nonmovant fails to produce more than a scintilla of evidence on the essential elements challenged, there is no need to analyze the movant's traditional grounds for summary judgment. *Ridgway*, 135 S.W.3d at 600.

A traditional motion for summary judgment is proper when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law on grounds plead and expressly set forth in the summary judgment motion. TEX. R. CIV. P. 166a(c); *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). When reviewing an order

10

granting a traditional motion for summary judgment, an appellate court must view all evidence favorable to the nonmovant as true and indulge every reasonable inference from the evidence in favor of the nonmovant. *Valence Operating Co.*, 164 S.W.3d at 661; *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

A no-evidence motion for summary judgment is essentially a pretrial motion for directed verdict in which the movant contends there are no material fact issues for a jury to decide because the nonmovant lacks adequate evidence to support at least one claim or defense. *See* TEX. R. CIV. P. 166a(i). A party may bring a no-evidence motion for summary judgment when, after an adequate time for discovery, there is no evidence of at least one essential element of a claim or defense on which the adverse party has the burden of proof at trial. *Id.* The no-evidence motion must clearly specify each element of the claim or defense for which the movant asserts there is no evidence. *Id.* A no-evidence motion for summary judgment should be granted if the nonmovant fails to present more than a scintilla of probative evidence to raise a genuine issue of material fact as to the challenged essential element. *Ridgway*, 135 S.W.3d at 600. A genuine issue of material fact exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms. v. Havner*, 953 S.W.3d 706, 711 (Tex. 1997) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)).

### NEGLIGENT MISREPRESENTATION

Negligent misrepresentation is a business-related tort akin to a professional malpractice claim except, unlike a professional malpractice claim based on the breach of a duty owed to a client or another in privity with the alleged tortfeasor, a negligent

11

misrepresentation claim is "based on the professional's 'manifest awareness' of the non-client's reliance [on misrepresented facts] and the professional's intention that the non-client rely on the professional's representations." *Ervin v. Mann Frankfort Stein & Lipp CPAS, LLP*, 234 S.W.3d 172, 177 (Tex. App.—San Antonio 2007, no pet.) (quoting *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999)). In a negligent misrepresentation cause of action, Texas law has long provided that before a professional accountant can owe a duty to a non-client for information contained in an audit report prepared by the accountant, the non-client must belong to a specified class or group of individuals that the accountant knows is going to receive the audit and reasonably rely on it in making relevant decisions. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001); *Ervin*, 234 S.W.3d at 177.

The generally recognized elements of a negligent misrepresentation claim are as follows: (1) the defendant made a representation in the course of the defendant's business; (2) the representation contains false information for the guidance of others in their businesses, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the representation, (4) the plaintiff justifiably relied on the representation, and (5) the defendant's negligent misrepresentation proximately caused the plaintiff's injury. *McCamish,* 991 S.W.2d at 791. In determining whether a claim for negligent misrepresentation is viable, courts look not to the rules governing the existence of privity; rather, they traditionally look to section 552 of the Restatement (Second) of Torts which provides, in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is

12

subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

RESTATEMENT (SECOND) OF TORTS § 522(1), (2) (1977).

The term "false information," as used in the context of a negligent misrepresentation claim, means the misstatement of an existing fact, not a promise of future conduct. *Lindsey Constr., Inc. v. AutoNation Fin. Services, LLC*, 541 S.W.3d 355, 366 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

**ANALYSIS**

In this particular case, LGT was originally retained by Reagor-Dykes to prepare an audit report of Reagor-Dykes's balance sheet-only, as of a static date: December 31, 2015. At the time of the engagement, it was specifically understood and agreed to by all parties that LGT would not audit any of Reagor-Dykes's income or cash flow statements. It was also agreed that no third party would be provided with a copy of the audit report without prior authorization. At the time of the initial engagement, LGT and Reagor-Dykes had an understanding that the audit was being sought for the purpose of a public offering or a private equity sale, not a loan application. In fact, when this agreement was entered into, Reagor-Dykes had not begun any loan negotiations with IBC.

13

In order to establish its negligent misrepresentation claims for both the 2015 Audit Report of the balance sheet-only and the 2016 Audit Report, IBC was required to establish that each report contained "false information" which LGT intended as guidance for others, that IBC belonged to a specified class or group of individuals or entities that LGT knew was going to receive those audits and reasonably rely on that information in making relevant financial decisions, that it reasonably relied on that information, and that it was damaged as a result of that reliance. LGT challenges each element.

IBC contends the 2015 Audit Report contains false information because it classified as "current" debt "substantial" sums which should have been classified as "due on demand," in violation of GAAP. IBC contends that this misclassification of debt (as opposed to a misstatement of debt) was material because it would have impacted the auditors undertaking of a "going concern" analysis had such an analysis been conducted. IBC further contends that the Audit Reports contain false information because they failed to properly classify notes receivable owed by Rick Dykes and Bart Reagor. According to IBC's expert, GAAP requires receivables from officers to be classified as a current asset only if they are collectible in the ordinary course of business within one year. IBC maintains that this misclassification of debt (again, as opposed to a misstatement of debt) was material because it made Reagor-Dykes appear to be a solvent "going concern" when, in fact, it was not. Finally, IBC contends that the Audit Reports contain false information because it was established in March 2017 that Reagor-Dykes was engaged in floor-plan fraud by selling automobiles out-of-trust and it was kiting checks to help cover its shortfall.

14

These claims fail to present any evidence of fraud or false information pertaining to operations conducted in 2015 or 2016, and as such could not have impacted either the 2015 or the 2016 Audit Reports. Essentially, IBC argues that LGT was deceptive in failing to include a "going concern qualification" in both Audit Reports. LGT responds that a professional accountant's duty to include a "going concern qualification" only pertains to its client's ability to continue as a going concern for a period of one year after the end of the audited financial period, which in this case would have been December 31, 2017 (one year after the 2016 audit). LGT further contends that because it is an undisputed fact that Reagor-Dykes did continue to function as a going concern until mid-2018, IBC could not have been harmed by the failure to include a "going concern" analysis. We agree.

Furthermore, IBC contends that the 2016 Audit Report contains false information because LGT failed to perform any "subsequent event" analysis regarding the fact that IBC had approved (but not fully funded) the Blue Sky Loan and the Real Estate Refinance Loan subsequent to the 2016 end-of-year analysis but prior to the publication of the audit. Failure to disclose information which is known to IBC is not the functional equivalent of making a false representation. Furthermore, even if such a failure to disclose could somehow be construed as a misrepresentation, it is hard to imagine how the failure to disclose information already known to IBC could ever amount to something that it *justifiably* relied on that proximately caused it any damages.

To establish its claim for negligent misrepresentation, IBC had the burden to prove that it *justifiably* relied on false information provided by LGT. As to the 2015 Audit Report, the uncontroverted evidence shows that the loan memorandum barely mentions the report (three sentences out of eighty-three pages). Furthermore, the summary judgment

15

evidence shows, even viewing that evidence in the light most favorable to IBC, that the factors relied on by IBC in its loan approval process did not depend on figures contained in the 2015 Audit Report (the only audit available at the time the loan decision was made). The summary judgment evidence shows that IBC approved the loans based on figures provided by Reagor-Dykes. The figures regarding cash flow, guarantor assets, and the value of real estate collateral were derived from in-house documents which were not audited by LGT.

As to the 2016 Audit Report, IBC maintains that, although the document was not published until after the Blue Sky Loan and the Real Estate Refinance Loan had been approved, it would not have funded most of the loan if the 2016 Audit Report had not contained the same material misrepresentations. For the same reasons set forth above, we find that IBC has failed to provide more than a scintilla of evidence that it justifiably relied on false information provided by LGT.

For these reasons, we find that IBC has failed to show that the trial court erred in granting summary judgment as to IBC's negligent misrepresentation claim. Issue one is overruled.

### FRAUDULENT MISREPRESENTATION

In addition to asserting a claim based on negligent misrepresentation, IBC also asserted a claim against LGT based on common-law fraud. Unlike a negligent misrepresentation claim, which requires proof that the nonmovant defendant provided false information, a fraudulent misrepresentation claim requires proof that the nonmovant intentionally provided a false representation. A cause of action for common-law fraud

16

exists when it is established that: (1) the defendant made a representation to the plaintiff that was (2) material, (3) false, and (4) (a) the defendant knew was false or (b) the defendant made recklessly, as a positive assertion of fact and without knowledge of its truth, (5) made by the defendant with the intent that the plaintiff act on it, (6) the plaintiff relied on the representation, and (7) the representation caused the plaintiff injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Aquaplex, Inc. v. Rancho La Valencia*, *Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). As such, a claim based on fraudulent misrepresentation differs from a negligent misrepresentation claim in that it requires the additional element of intent—i.e., that the misrepresentation be made with the specific intent that the plaintiff rely on the information misrepresented. IBC argued that the classification of the shareholder receivables in the 2015 Audit Report was false and that it was made with the intent that IBC rely on that misrepresentation. This argument fails, however, because the 2015 Audit Report was issued several months before Reagor-Dykes initiated any banking relationship with IBC. As such, it would have been impossible for LGT to have made the misrepresentation, if one was made, with the intent that IBC rely on it in making its financial decisions. IBC also relies on the out-of-trust automobile sales and kited checks as evidence that Reagor-Dykes was not a "going concern" in 2016. Proof of the out-of-trust automobile sales or the check kiting, both discovered in 2017, is not evidence that LGT made a fraudulent misrepresentation in either the 2015 or 2016 Audit Reports.

We find IBC has failed to show the trial court erred in granting summary judgment as to its cause of action for fraudulent misrepresentation as to each Audit Report. As

such, we find the trial court did not err in granting LGT's motion for summary judgment. Issue two is overruled.

### CONCLUSION

We affirm the judgment of the trial court.

Patrick A. Pirtle
Senior Justice