**Opinion issued August 1, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-21-00727-CV**

———————————

**MOLINA HEALTHCARE OF TEXAS, INC., Appellant**

**V.**

**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA AND EMERGENCY SERVICES OF TEXAS, PA, Appellees**

---

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Case No. 2017-777084**

---

**MEMORANDUM OPINION**

This case involves a dispute over reimbursement rates for doctors who provided out-of-network emergency medical care to a health insurance company's insureds. Appellees ACS Primary Care Physicians Southwest, PA and Emergency

Services of Texas, PA (collectively, "the providers") asserted claims against appellant Molina Healthcare of Texas, Inc. ("Molina") for a violation of Insurance Code section 1271.155(a) relating to payment for emergency care performed by non-network physicians, violation of the Insurance Code's prohibition against unfair claim settlement practices, breach of an implied-in-fact contract, and quantum meruit.

A jury found in favor of the providers on all their asserted claims and awarded damages. The trial court entered judgment on the jury verdict and awarded the providers approximately $1.6 million in actual damages and $3.1 million in treble damages under the Insurance Code. The parties agreed to submit the issue of attorney's fees to the trial court, and the court awarded approximately $5.1 million in trial-level attorney's fees and $430,000 in conditional appellate attorney's fees.

While this case was pending on appeal, the Texas Supreme Court issued an opinion holding that (1) no private right of action exists under Insurance Code section 1271.155(a), (2) emergency care providers may not use the prohibitions against unfair settlement practices under Insurance Code chapter 541 to raise a claim that an insurance company underpaid reimbursement rates under section 1271.155(a), and (3) emergency care providers cannot maintain a claim against an insurance company for quantum meruit. *See Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424 (Tex. 2023). The parties agree that as a

2

result of this decision, the providers cannot recover under these three claims, and these claims are therefore no longer at issue in this appeal.

In its remaining two arguments, Molina contends that (1) the providers' claim for breach of an implied contract is an impermissible repackaging of claims the Texas Supreme Court has held cannot be brought against insurers and no evidence supports this claim because there is no evidence of a meeting of the minds, no evidence of consideration, and no evidence of breach of an implied contract; and (2) the providers cannot recover attorney's fees on their claim for breach of an implied contract.

We reverse and render judgment.

## Background

### A.     Relationship Between the Parties and the Relevant Regulatory Scheme

Molina is a health maintenance organization ("HMO") that offers a variety of health insurance plans to its insureds, including commercial plans through the federal exchange established by the Patient Protection and Affordable Care Act ("ACA"). Molina's ACA plans are the health insurance plans involved in this case.

ACS Primary Care Physicians Southwest, PA ("ACS") is a "professional emergency medicine services group practice" that staffs emergency departments at hospitals and medical centers throughout Texas, including eight hospitals in the Memorial Hermann system in the Houston area. Emergency Services of Texas, PA

3

("Emergency Services") staffs emergency departments at hospitals primarily in the El Paso area. Neither ACS nor Emergency Services has an express contract with Molina setting out agreed reimbursement rates for emergency care provided to Molina's insureds. The providers are therefore "out of network" with Molina.

Both federal and state law require hospitals to provide stabilizing emergency care for patients regardless of the patient's insurance status or ability to pay. *See* 42 U.S.C. § 1395dd(b), (c); TEX. HEALTH & SAFETY CODE §§ 241.027–.028, 311.022; *Tex. Med. Res.*, 659 S.W.3d at 427. Insurance Code section 1271.155(a) provides that an HMO such as Molina "shall pay for emergency care performed by non-network physicians or providers at the usual and customary rate or at an agreed rate." TEX. INS. CODE § 1271.155(a). The statute does not define "usual and customary rate." The HMO's health care plan must provide coverage for "necessary emergency care," including "the treatment and stabilization of an emergency medical condition." *Id.* § 1271.155(b). The health care plan "shall comply with this section regardless of whether the physician or provider furnishing the emergency care has a contractual or other arrangement with the [HMO] to provide items or services to covered enrollees." *Id.* § 1271.155(e).

In 2019, the Texas Legislature amended multiple provisions of the Insurance Code to address, among other things, how to resolve payment disputes between out-of-network emergency care providers and HMOs. *See Tex. Med. Res.*, 659 S.W.3d

4

at 428. The new provisions include "a mandatory binding arbitration process for disputes between an insurer and an out-of-network emergency-care physician over the amount the insurer must pay the physician for care rendered to an individual enrolled in the insurer's plan." *Id.*; *see* TEX. INS. CODE §§ 1467.081–.089. An out-of-network provider or an insurance company may not file suit for an out-of-network claim until after the conclusion of the arbitration proceeding on the issue. *Tex. Med. Res.*, 659 S.W.3d at 428–29; TEX. INS. CODE § 1467.085(a). This arbitration process, however, only applies to health care services rendered on or after January 1, 2020. *Tex. Med. Res.*, 659 S.W.3d at 429; Act of May 24, 2019, 86th Leg., R.S., ch. 1342, § 5.01, 2019 Tex. Gen. Laws 3940, 3963. It is undisputed that this lawsuit does not involve health care services rendered on or after January 1, 2020. At the time the providers rendered the services at issue in this dispute, no court had opined on the remedies available to an out-of-network provider alleging underpayment by an HMO for emergency care services.

## B.    Procedural Background

The providers filed the underlying lawsuit in November 2017. The providers alleged that between January 2016 and August 2019, they provided emergency medical services to Molina insureds, and they directly billed Molina for payment of over 13,000 claims arising from these services. The providers billed Molina $19,373,648.

Molina determined that all claims at issue involved medically necessary, covered health care services, and therefore the claims were payable. However, Molina allegedly paid the providers "at rates substantially less than both [the providers'] billed charges and the 'usual and customary rate' in [the providers'] geographic area." Molina paid the providers $2,115,932. The providers alleged that they had suffered damages "in an amount equal to the difference between the amounts allowed as payable by Molina and the lesser of [the providers'] charges and the 'usual and customary rate' for professional emergency medicine services in the same geographic area, plus [the providers'] loss of use of that money."

The providers asserted several causes of action against Molina. They first alleged that Molina had violated Insurance Code section 1271.155(a). Molina and the providers had not agreed to a specific rate for claims for emergency services, so Molina was required to pay the providers "either their billed charges or the 'usual and customary rate' in their geographic area for the emergency medicine services provided" to Molina's insureds. However, Molina instead paid the providers "at rates substantially below both [the providers'] billed charges and the 'usual and customary rate' for the emergency medical services" provided to the insureds.

The providers further alleged that Molina had engaged in unfair claims settlement practices under the Insurance Code by (1) underpaying the providers' claims and thus failing to attempt in good faith to effectuate a prompt, fair, and

6

equitable settlement of claims with respect to which Molina's liability had become reasonably clear; and (2) refusing to pay claims without conducting a reasonable investigation with respect to the reimbursement rates for the claims. *See* TEX. INS. CODE § 541.060(a)(2)(A), (a)(7). The providers sought actual damages for this cause of action and also alleged that Molina had knowingly violated the Insurance Code, entitling the providers to treble damages.

The providers also asserted a claim for breach of an implied-in-fact contract. They alleged that they were obligated under law "to provide emergency medicine services to all patients presenting at the emergency departments they staff, including Molina patients," and Molina was obligated by law to pay "for emergency care performed by non-network physicians or providers at the usual and customary rate or at an agreed rate." The providers "appropriately billed Molina" for emergency services rendered to Molina insureds "based on Molina's implied agreement to reimburse [the providers] for those services at rates that complied with Texas law." The providers had a "reasonable expectation and understanding" that Molina would reimburse them "at rates in accordance with the standards established under Texas law," but Molina instead breached the parties' implied agreement by reimbursing the providers at rates substantially lower than the "usual and customary rate."

In addition, the providers asserted a claim for "unjust enrichment/breach of implied-in-law contract."[1] The providers alleged that they conferred a benefit on Molina by providing emergency services to Molina's insureds, and Molina owes its insureds an obligation to pay the providers for covered medical services received by the insureds. Through the providers' provision of emergency medical services, Molina "fulfills its obligations" to its insureds. However, despite knowing that the providers expected to be paid "at rates in accordance with the standards established under Texas law," Molina unjustly enriched itself by refusing to pay the providers at those rates.

A jury trial on the providers' claims occurred in June 2021. The providers presented evidence that they are affiliated with a company called TeamHealth. TeamHealth has a number of different entities under its umbrella, but its overarching purpose is to provide administrative services to physician groups.[2] TeamHealth

---

[1]    On appeal, the parties refer to this claim as a claim for quantum meruit, and we adopt the parties' terminology for this claim. *See Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (stating that while unjust enrichment "is an independent cause of action," plaintiff's claim that opposing party was unjustly enriched by retaining benefits of services rendered by plaintiff "can also be the basis for a quantum meruit cause of action, rather than a separate claim in itself").

[2]    The precise organizational structure of the TeamHealth family of companies and the ownership of the providers is not relevant to disposition of this appeal. For the sake of this appeal, it suffices to state that TeamHealth took care of most administrative responsibilities for the providers, including contracting with insurance companies, coding of medical services, invoicing, and handling payment disputes.

employees, for instance, were the ones involved with setting the prices for the providers' billed charges and trying to negotiate a contract with Molina for reimbursement rates so the providers could be "in network."

Generally, TeamHealth used a national database called FAIR Health to set their billed charges. FAIR Health is a database created by a nonprofit organization to collect health insurance claims information and pricing for different medical services from across the country. TeamHealth tried to set their charges for medical services "based on the FAIR Health 80th percentile of charges in the Marketplace." A TeamHealth employee testified that while TeamHealth considered these charges reasonable, it sometimes agreed to discount their charges in order to become "in network" with a particular insurance company. TeamHealth attempted to negotiate a contract between Molina and the providers, proposing that Molina reimburse the providers at 325% of the Medicare rates for emergency care services provided to Molina insureds, but Molina would not offer more than 130% of Medicare. TeamHealth characterized this rate as "a fraction" of what similarly situated insurance companies agreed to pay as reimbursement, and it did not sign a contract with Molina.

Molina employees testified that they generally start negotiations with providers at 100% of the Medicare rates, which Molina believed was a reasonable rate. When Molina could not reach an agreement with a provider, Molina's

reimbursement rates for out-of-network physicians and providers was based on the median of Molina's "contracted provider network" within a specific service area.[3] Molina did not take the charges billed by providers into consideration when setting its out-of-network reimbursement rates. A Molina employee testified that the providers' billed charges were "not really relevant" because providers can increase their prices at any time, and these prices are "an arbitrary number" and are "really not the market rate." Molina argued that its reimbursement rates, which were closely tied to the Medicare rate, satisfied the requirement that it pay out-of-network providers the "usual and customary" rate.

The providers vehemently contested this argument by Molina and asserted that their billed charges established the "usual and customary" rate. The providers' damages expert, an economist, conducted several different statistical analyses and ultimately concluded that Molina had underpaid the providers by $11.1 million. Specifically, Molina had underpaid ACS by $9,727,296 and Emergency Services by $1,326,450. Although this expert was not asked to opine on whether the providers' billed charges "were an appropriate measure of damages under Texas law," she was

---

[3] Molina considered a federal regulation known as the "Greatest of Three" in setting its out-of-network reimbursement rates. Under this regulation, which was promulgated pursuant to the Affordable Care Act, HMOs can look to three different options in setting their out-of-network reimbursement rates for emergency care: (1) the median of the HMO's in-network negotiated rates, (2) the usual method used to calculate their rates for out-of-network services, and (3) the Medicare rate. *See* 45 C.F.R. § 147.138(b)(3)(i)(A)–(C).

asked to calculate, for both providers, the difference between the amount the provider billed and the amount Molina paid the provider. These amounts equaled $15,332,215 for ACS and $1,925,501 for Emergency Services. The providers requested that the jury award these last two amounts as actual damages for several of the damages questions.

After the parties rested, Molina moved for directed verdict on each of the providers' claims. With respect to the providers' claim for breach of an implied contract, Molina asserted several reasons why a directed verdict was proper, including that there was "no evidence of a meeting of the minds between the parties." Molina argued that the reimbursement rate "is an essential term of the contract" and no contract can exist "without agreement on an essential term," but the evidence "conclusively establishes the plaintiffs and defendants never agreed on a reimbursement rate." The trial court denied the request for a directed verdict on this claim.

The trial court submitted fourteen questions to the jury in the written charge.[4] The jury found in favor of the providers on their claims for violation of Insurance

---

[4]  Molina objected to submission of each question in the charge. With respect to the question on implied contract, Molina argued that "there is no evidence to support any of the elements of an enforceable contract," including a meeting of the minds. Molina also objected on the following basis:

> Defendant objects to the instruction concerning the lack of agreement on price and presumes price on the ground that the instruction is defective and represents an incorrect statement of the law. A

Code section 1271.155(a), violation of the unfair settlement practices provisions of Insurance Code chapter 541, and quantum meruit. For each of these claims, the jury awarded ACS $1,398,742.86 and Emergency Services $188,206.40 in actual damages. The jury further found that Molina knowingly committed the unfair settlement practices, and it awarded ACS $12,500,000 and Emergency Services $5,000,000 in additional damages for both knowing violations.

With respect to the providers' claim for breach of an implied contract, the jury found that the providers and Molina agreed that Molina would pay the providers for medical services rendered to Molina's insureds, but Molina failed to comply with these agreements. As damages, the jury again awarded ACS $1,398,742.86 and Emergency Services $188,206.40. The providers moved for the trial court to enter

reasonable price cannot be presumed when price is an essential element of the purported contract over which the parties unsuccessfully negotiated.

Molina submitted proposed jury questions related to this claim, including a question asking whether the providers and Molina "agree[d] on the reimbursement rate" at which Molina would pay the provider for any emergency care the provider rendered to Molina's insureds. Molina also requested an instruction, based on language from a San Antonio Court of Appeals case, that if the provider and Molina "discussed, but did not agree on, the reimbursement rate" that Molina would pay, the jury "cannot imply a reimbursement rate into any implied contract between the parties." *See MGR, Inc. v. Geico Cas. Co.*, No. 04-18-00452-CV, 2019 WL 573968, at *2–3 (Tex. App.—San Antonio Feb. 13, 2019, no pet.) (mem. op.) (concluding that no evidence existed of mutual assent to pay "reasonable and necessary cost of repairs"). The trial court overruled Molina's objections, and it denied Molina's requested submissions.

12

judgment on the jury verdict, arguing that they were entitled to recover damages on each of their claims.

The parties agreed to submit the question of attorney's fees to the trial court. In their motion for entry of judgment, the providers requested that the trial court award them over $5.6 million in trial-level attorney's fees and over $400,000 in conditional appellate attorney's fees. The providers also filed a separate motion for attorney's fees. The providers supported their request for attorney's fees with extensive billing records and invoices. Molina opposed the providers' request for attorney's fees.

The trial court signed a final judgment on September 27, 2021. Molina moved for judgment notwithstanding the verdict and to modify the final judgment. Among other arguments, Molina argued that there was legally insufficient evidence to support the providers' breach of an implied-in-fact contract claim because there was no evidence the parties agreed on the rate to be paid to the providers, an essential term of the contract.

The trial court signed an amended final judgment on December 30, 2021. After reciting the findings by the jury, the trial court awarded $1,398,742.86 in actual damages to ACS and $188,206.40 in actual damages to Emergency Services. The court awarded $2,797,485.72 to ACS and $376,412.80 to Emergency Services as additional damages for Molina's knowing violations of Insurance Code chapter 541.

13

The court also awarded pre-judgment interest on actual damages, $5,128,733.19 in trial-level attorney's fees, pre-judgment interest "of attorney's fees paid prior to entry of judgment," $434,431 in conditional appellate attorney's fees, court costs, and post-judgment interest. The court further ordered that if the providers' chapter 541 claims are reversed on appeal, the providers should be awarded "the next highest recovery under [the providers'] remaining theories as found by the jury."

This appeal followed.

## C. The Texas Supreme Court's Decision in *Texas Medicine Resources, LLP v. Molina Healthcare of Texas, Inc.*

At the time this case was pending in the trial court, other state and federal courts in Texas were also considering the issues raised in this case: specifically, whether Insurance Code section 1271.155(a) creates a private right of action for out-of-network emergency care providers to sue HMOs for alleged underpayment of reimbursement rates and whether the care providers can pursue remedies such as a suit for violation of Insurance Code chapter 541 or a suit for quantum meruit.

Federal district courts in Texas reached conflicting decisions on whether the language of section 1271.155(a) created a private right of action for non-network physicians and providers. Two judges in the Northern District of Texas ruled that section 1271.155(a) did not create a private right of action.[5] *See Apollo MedFlight,*

_____

[5]     The court in *Apollo MedFlight* also ruled that because the emergency care provider had no right of action under Insurance Code 1271.155(a), the defendant insurer

14

*LLC v. Bluecross Blueshield of Tex.*, No. 2:18-CV-166-Z-BR, 2019 WL 4894263, at \*3 (N.D. Tex. Oct. 4, 2019); *Angelina Emergency Med. Assocs. PA v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 436 (N.D. Tex. 2020). A judge in the Southern District of Texas, however, concluded otherwise and ruled that the Texas Legislature intended for section 1271.155(a) to create a private cause of action. *ACS Primary Care Physicians SW., P.A. v. UnitedHealthcare Ins. Co.*, 514 F. Supp. 3d 927, 936–39 (S.D. Tex. 2021), *rev'd*, 60 F.4th 899 (5th Cir. 2023). In light of the earlier decisions from the Northern District of Texas that reached a different result, the Southern District certified an immediate interlocutory appeal of the issue to the Fifth Circuit. *See ACS Primary Care Physicians SW., P.A. v. UnitedHealthcare Ins. Co.*, No. 4:20-CV-01281, 2021 WL 6617719, at \*1 (S.D. Tex. Feb. 10, 2021) (order). The Fifth Circuit accepted the appeal and certified the question to the Texas Supreme Court. *See ACS Primary Care Physicians SW., P.A. v. UnitedHealthcare Ins. Co.*, 26 F.4th 716, 719–20 (5th Cir. 2022).

---

could not be liable to the care provider for unfair settlement practices under Insurance Code chapter 541, and therefore the plaintiff lacked standing to pursue that claim. *See Apollo MedFlight, LLC v. Bluecross Blueshield of Tex.*, No. 2:18-CV-166-Z-BR, 2019 WL 4894263, at \*3 (N.D. Tex. Oct. 4, 2019); *see also Angelina Emergency Med. Assocs. PA v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 437 (N.D. Tex. 2020) (reasoning that plaintiff emergency care providers lacked standing to bring chapter 541 claims because such claims belonged to patients and are not assignable under Texas law). The court in *Angelina Emergency Medical Associates* also ruled that the emergency care providers could not successfully maintain a quantum meruit claim against the insurers because the care providers did not render medical care for the benefit of the defendant insurers. *See* 506 F. Supp. 3d at 431–32.

Meanwhile, in state court, the Dallas Court of Appeals also addressed this question. *See Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 620 S.W.3d 458 (Tex. App.—Dallas 2021), *aff'd*, 659 S.W.3d 424 (Tex. 2023). In that case, the doctors provided emergency care to nearly 4,000 Molina insureds throughout 2017 and 2018 but allegedly were not reimbursed at the doctors' "usual and customary rate." *Id.* at 462. The doctors asserted claims against Molina for violation of section 1271.155(a), violation of Insurance Code chapter 541, quantum meruit, and declaratory relief. *Id.* Molina filed a plea to the jurisdiction, arguing that the doctors lacked standing to bring claims under the Insurance Code and that the doctors' quantum meruit claim failed because no direct relationship existed between the doctors and Molina. *Id.* The trial court granted Molina's plea to the jurisdiction and dismissed the doctors' claims. *Id.* at 463.

Ultimately, the Dallas Court concluded that section 1271.155(a) "does not create a private right of action in favor of non-network physicians or providers." *Id.* at 468. The court further held that chapter 541 did not apply to the doctors because they were not Molina's insureds or beneficiaries; their claim under that chapter was predicated on a violation of section 1271.155(a), which was "jurisdictionally unsupported"; and chapter 541 claims were not assignable from Molina's insureds to the doctors. *Id.* at 468–69. The Dallas Court also held that the doctors' claim for quantum meruit failed because that claim sought "to enforce the same payment

16

obligations [the doctors] cannot enforce under the emergency care statute," and the court would not allow a claim in equity "that merely repackages a statutory claim the legislature declined to create." *Id.* at 470. Additionally, the court held that the trial court's dismissal of the quantum meruit claim was proper because the doctors' allegations did not "establish that they rendered valuable services to Molina," and any benefit to Molina from providing emergency care to Molina's insureds was "too indirect and attenuated to support a quantum meruit claim." *Id.* at 470–71.

The Texas Supreme Court granted review of the Dallas Court's decision and consolidated the appeal with the certified question from the Fifth Circuit in *ACS Primary Care Physicians Southwest, P.A. v. UnitedHealthcare Insurance Co.* The court held that the language of section 1271.155(a) does not clearly imply a private cause of action for damages, and therefore the doctors could not maintain this claim against Molina. *See Tex. Med. Res.*, 659 S.W.3d at 436. With respect to the doctors' quantum meruit claim, the Texas Supreme Court agreed with the Dallas Court of Appeals that the doctors could not establish that their efforts in providing emergency care to Molina's insureds were undertaken *for* Molina. *Id.* at 436–37. Finally, with respect to the doctors' unfair settlement practices claim under Insurance Code chapter 541, the court noted that "failing to attempt a good-faith settlement is only unfair 'with respect to a claim by an insured or beneficiary,'" and the doctors did not qualify as either an insured or a beneficiary. *Id.* at 438. The court further reasoned

17

that in light of its holding that the doctors could not recover the difference between the payment they received and the "usual and customary rate" in a private cause of action under section 1271.155(a), "it would be odd indeed if they could potentially recover three times that amount by pleading the same claim under Chapter 541."[6] *Id.*

As discussed above, the jury in this case found in favor of the providers on each of the four claims that they asserted: (1) a claim for violation of Insurance Code section 1271.155(a); (2) a claim for violation of the unfair settlement provisions in Insurance Code chapter 541; (3) a claim for quantum meruit; and (4) a claim for breach of an implied-in-fact contract. The trial court entered judgment on the verdict and awarded the providers damages under the chapter 541 theory, which yielded the greatest recovery to the providers. While this case was pending on appeal, the Texas Supreme Court held, in a legally and factually indistinguishable case, that (1) section 1271.155(a) does not create a private right of action; (2) emergency care providers cannot maintain a chapter 541 action for unfair settlement practices against insurance companies for allegedly underpaying reimbursement amounts under

---

[6] The Texas Supreme Court also held that claims under chapter 541 were "personal to the insured" and may not be assigned, and therefore the doctors could not rely on assignments of the insureds' benefits, allegedly completed during the patient-intake process. *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 438–39 (Tex. 2023). The court also noted that the doctors were not suing Molina "for engaging in unfair settlement practices with respect to claims by Molina's insureds," but were instead alleging that Molina "engaged in unfair practices with respect to claims asserted *by them*, and those claims are not actionable under Section 541.060(a)." *Id.* at 439.

section 1271.155(a); and (3) emergency care providers cannot maintain a claim for quantum meruit against insurance companies because they cannot establish that they rendered services for the benefit of the insurance companies. Molina and the providers agree that the providers' only cause of action that potentially survives the Texas Supreme Court's decision in *Texas Medicine Resources* is the providers' claim for breach of an implied-in-fact contract.[7] We therefore turn to that claim.

## Implied-in-Fact Contract

In its fourth issue, Molina argues that the providers cannot recover for breach of an implied-in-fact contract. Molina argues that, first, this claim is merely an impermissible repackaging of the providers' section 1271.155(a) claim, which the Texas Supreme Court has held is not viable. Second, Molina argues that an implied contract cannot exist when an essential term—here, the reimbursement rate—is disputed. Finally, Molina argues that legally insufficient evidence supports the jury's findings on this claim because the providers presented no evidence of a meeting of the minds on the reimbursement rate, no evidence of consideration, and no evidence of breach of an implied contract.

---

[7]    We therefore need not address Molina's first, second, and third issues, all of which challenge the jury's findings on the section 1271.155(a), chapter 514, and quantum meruit claims.

19

## A.    Standard of Review

In conducting a legal sufficiency review, we consider whether the evidence at trial would enable a reasonable and fair-minded jury to reach the verdict under review. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017).

The record contains more than a scintilla of evidence when the evidence rises to a level that enables reasonable and fair-minded people to differ in their conclusions. *Gunn*, 554 S.W.3d at 658; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is 'so weak as to do no more than create a mere surmise or suspicion.'" *Gunn*, 554 S.W.3d at 658 (quoting *King Ranch*, 118 S.W.3d at 751). We must consider the record evidence in the light most favorable to the party in whose favor the verdict has been rendered, and we indulge

every reasonable inference deducible from the evidence in that party's favor. *Id.* (quoting *Bustamante*, 529 S.W.3d at 456).

When, as here, a party properly preserves error by objecting to submission of a particular question in the court's jury charge, we evaluate the sufficiency of the evidence against the charge the trial court should have given. *Berkel & Co. Contractors, Inc. v. Lee*, 612 S.W.3d 280, 284 (Tex. 2020); *see St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

## B.  Governing Law

An express contract exists when the terms of the contract are explicitly established by the parties. *Pearl Res. LLC v. Charger Servs., LLC*, 622 S.W.3d 106, 116 (Tex. App.—El Paso 2020, pet. denied); *E-Learning LLC v. AT&T Corp.*, 517 S.W.3d 849, 858 (Tex. App.—San Antonio 2017, no pet.). An implied-in-fact contract, on the other hand, derives its terms "from the acts and conduct of the parties thereto." *Pearl Res.*, 622 S.W.3d at 116; *see Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972) (stating that implied-in-fact contracts "arise[] from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract").

The elements of an express contract and an implied-in-fact contract are identical. *E-Learning*, 517 S.W.3d at 858; *Plotkin v. Joekel*, 304 S.W.3d 455, 476

21

(Tex. App.—Houston [1st Dist.] 2009, pet. denied). To establish formation of an express or implied contract, the plaintiff must prove: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Plotkin*, 304 S.W.3d at 476 (quoting *DeClaire v. G&B McIntosh Fam. Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.)). The "real difference" between express and implied contracts "is in the character and manner of proof required to establish them." *Id.* at 476–77 (quoting *Haws & Garrett Gen. Contractors*, 480 S.W.2d at 609); *see Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009) ("The difference between contracts formed through express promises and those formed through implied promises is the means by which the contracts are formed.").

Both express and implied contracts require a showing of mutual agreement. but with an implied contract, this "is inferred from the circumstances." *Plotkin*, 304 S.W.3d at 477; *see also Fielding*, 289 S.W.3d at 850 ("Regardless of whether a contract is based on express or implied promises, mutual assent must be present."); *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008) (stating that "meeting of the minds" is essential element of implied-in-fact contract) (quotations omitted). With an implied contract, mutual assent is "inferred from the circumstances." *Plotkin*, 304 S.W.3d at 477

22

(quoting *Haws & Garrett Gen. Contractors*, 480 S.W.2d at 609); *see Fielding*, 289 S.W.3d at 850 ("In the case of an implied contract, however, mutual assent is inferred from the circumstances."). "A meeting of the minds is implied from and evidenced by the parties' conduct and course of dealing." *E-Learning*, 517 S.W.3d at 858; *see Ervin v. Mann Frankfort Stein & Lipp CPAs, L.L.P.*, 234 S.W.3d 172, 183 (Tex. App.—San Antonio 2007, no pet.) ("The determination of whether there is a meeting of the minds must be based upon objective standards of the parties' actions, not on their alleged subjective states of mind.").

To be enforceable, a contract must address all essential and material terms with a reasonable degree of certainty and definiteness. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (internal quotation omitted); *see T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("The material terms of the contract must be agreed upon before a court can enforce the contract. Where an essential term is open for future negotiation, there is no binding contract."). An agreement's "essential terms" are "those that parties would reasonably regard as 'vitally important ingredient[s]' of their bargain." *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 368–69 (Tex. 2019) (quoting *Fischer*, 479 S.W.3d at 237). "Whether particular terms are essential generally depends on the specific contract at issue." *Id.* at 369. Typically, the "essential terms" of a contract include "the time of performance, the price to be paid, . . . [and] the service

23

to be rendered." *City of Houston v. Williams*, 353 S.W.3d 128, 138–39 (Tex. 2011) (quoting *Kirby Lake Dev. Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010)).

A contract must "at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Cadence Bank, N.A. v. Elizondo*, 642 S.W.3d 530, 534 (Tex. 2022) (quoting *Fischer*, 479 S.W.3d at 237). The contract also must be sufficiently definite to "enable a court to understand the parties' obligations" and to "give an appropriate remedy if they are breached." *Id.* (quoting *Fischer*, 479 S.W.3d at 237).

## C. Whether the Providers Can Recover on Their Claim for Breach of Implied-In-Fact Contract

### 1. *Preservation of Error*

On appeal, Molina argues that it and the providers "do not deal with each other voluntarily." Instead, all instances in which Molina was required to reimburse the providers for emergency medical care rendered to Molina's insureds were "compelled transactions," and an implied contract cannot exist when the essential term—the reimbursement rate—is disputed in a compelled transaction. In response, the providers contend that Molina did not argue in the trial court that "the 'compelled' nature of the parties' transaction rendered price the '*only* essential term remaining,'" and therefore Molina did not preserve this issue for our review.

24

Although Molina did not use the phrase "compelled transaction" in the trial court, it did argue during its motion for a directed verdict that the existence of preexisting statutory obligations did not imply a contract. It further argued that the jury could not imply agreement on a reasonable price when the parties negotiated on price but failed to reach an agreement on that issue. Molina argued that "[t]his is not a situation in which the parties simply didn't talk about price and agreed that they would enter into a transaction." Instead, because the parties specifically negotiated and did not reach an agreement, a price could not be implied, "and there's no basis for an implied-in-fact contract claim." Molina also objected on this basis during the charge conference when it objected to submission of Question 10 and its accompanying instruction relating to formation of an implied contract by arguing that there was no evidence to support any elements of an enforceable implied contract—including no evidence of a meeting of the minds—and arguing that a reasonable price could not be presumed when the parties unsuccessfully negotiated over that matter.

We therefore conclude that Molina properly preserved this issue for appellate review. *See C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 786 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (stating that legal sufficiency challenge can be preserved in several ways, including by motion for directed verdict and by objection to submission of issue to jury).

## 2. *Evidence of a Meeting of the Minds*

Molina argues that the parties did not agree on the rate at which Molina would reimburse the providers for emergency care provided to Molina's insureds, an essential term of any purported implied agreement. Therefore, there was no evidence of a meeting of the minds, a required element for any contract, express or implied. Molina argues that because there was no evidence of a meeting of the minds, the trial court should have granted Molina's motion for directed verdict, and the question whether the parties had an implied contract should not have been submitted to the jury.

The providers, on the other hand, argue that while a meeting of the minds is necessary to form a binding contract, a specific dollar amount is not required for the contract to be enforceable. *See Penwell v. Barrett*, 724 S.W.2d 902, 905 (Tex. App.—San Antonio 1987, no writ); *see also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam) ("[T]he absence of a fixed total price for services does not indicate a failure of the parties to reach a meeting of the minds with regard to the essential terms of the contract."). "Where the parties have done everything else necessary to make a binding agreement for the sale of goods or services, their failure to specify the price does not leave the contract so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended." *David J. Sacks, P.C.*, 266 S.W.3d at 450 (quotations omitted). We

26

disagree with the providers that this is a situation in which it can be implied that the parties agreed on a "reasonable price," or on the "usual and customary" rate to use the language of section 1271.155(a).[8]

In *David J. Sacks, P.C.*, which involved payment for legal services, Haden hired David Sacks and his law firm as appellate counsel in a pending matter, and the parties signed a written engagement letter. *Id.* at 448. The letter set out Sacks' scope of work, which was the writing of an appellant's brief and a reply brief, with a future decision about "who should argue the case" if the Fifth Circuit granted oral argument; his usual hourly rate of $300 per hour; a statement that his "rate for this particular matter will be $200.00 per hour"; the rates of other lawyers and paralegals in his firm; and Haden's responsibility for payment of all costs and expenses as incurred. *Id.* at 448–49. The letter requested that Haden pay a $10,000 retainer to be applied to fees and expenses. *Id.* at 449. Haden signed the agreement, but he changed the retainer amount from $10,000 to $5,000. *Id.* When he submitted a $5,000 payment, he included a letter referencing a telephone conversation with Sacks in which the parties allegedly agreed to reduce the retainer amount to $5,000. *Id.* After

---

[8] In the jury charge for the implied contract question, the trial court instructed the jury that "[t]he parties may have reached an agreement even if they did not agree on the price Molina would pay the Plaintiffs." The court further instructed that if the jury "find[s] that the parties otherwise agreed that Molina would pay the Plaintiffs but did not agree on the price, you may presume that the parties intended that Molina would pay Plaintiffs a reasonable price for the Plaintiffs' services."

completing work for Haden, Sacks sought payment of his attorney's fees, requesting that Haden pay an outstanding balance of over $35,000. *Id.* Haden only paid an additional $5,000, asserting that he had "'made it clear' that $5,000 was all he could afford to spend." *Id.*

The Texas Supreme Court addressed whether Haden raised a fact issue on whether a meeting of the minds existed between the parties when they entered into the fee agreement. *Id.* at 450. The court stated:

> A meeting of the minds is necessary to form a binding contract. However, the absence of a fixed total price for services does not indicate a failure of the parties to reach a meeting of the minds with regard to the essential terms of the contract. Where the parties have done everything else necessary to make a binding agreement for the sale of goods or services, their failure to specify the price does not leave the contract so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended. Though Sacks did not specify an exact total price for his services, the specified hourly rates confirm that the parties agreed that Sacks would charge and Haden would pay a reasonable price. The contract was explicit as to the services to be rendered and the manner that would be used in determining the price, and was therefore sufficiently clear to demonstrate a meeting of the minds between the parties as to all essential terms of the contract.

*Id.* (citations and quotations omitted).

We do not believe that this case is comparable to *David J. Sacks, P.C.* In that case, the parties negotiated and signed a written engagement letter for the provision of legal services. *Id.* at 448. That letter set out the scope of the attorneys' work, the hourly rates for personnel in the office, the client's responsibility for payment of

expenses, and the requirement that the client pay an amount as a retainer to be applied against fees and expenses. *Id.* at 448–49. A disagreement between the parties arose with respect to the amount that the client would pay for the legal services rendered. *Id.* at 449. Despite this disagreement, it was clear that the parties had intended to form a contractual relationship. The parties did not agree on the total amount of legal fees that the client would be responsible for paying, but they had "done everything else necessary to make a binding agreement for the sale of goods or services." *Id.* at 450. As a result, a "reasonable price" would be implied, and the contract was enforceable because the terms were "sufficiently clear to demonstrate a meeting of the minds between the parties as to all essential terms of the contract." *Id.*

By contrast, this case does not present a situation in which the providers and Molina "have done everything else necessary to make a binding agreement for the sale of goods or services" but simply did not specify the price, or the reimbursement rate. *See id.* Instead, the evidence shows that the parties reached *no* agreement. The parties negotiated, but they could not agree on the reimbursement rate to be paid. As a result, they did not sign a contract, and the providers remained out-of-network with Molina.

At trial, three issues related to the providers' implied-in-fact contract claim were undisputed. First, it was undisputed that under federal and state law, the

providers had an obligation to render stabilizing emergency care to any patient who presented at their facilities, including Molina's insureds, regardless of the patient's insurance status or ability to pay. Second, it was undisputed that Texas law required Molina, an HMO, to "pay for emergency care performed by non-network physicians or providers at the usual and customary rate or at an agreed rate." *See* TEX. INS. CODE § 1271.155(a). Third, it was undisputed that the providers and Molina did not have an express contract between them, and therefore the providers were "out of network" with Molina.

What constituted a "usual and customary rate" for emergency medical services, on the other hand, was disputed at trial. The parties have not agreed on this issue at any point in the trial proceedings or on appeal.[9]

The evidence at trial included testimony concerning negotiations between the providers—through their affiliated entity TeamHealth—and Molina. Kent Bristow, the senior vice president over revenue management at TeamHealth, testified that TeamHealth's goal is to help their "doctor groups," such as the providers, become "in network" with insurance companies. TeamHealth has successfully negotiated such contracts in the past, and with respect to the providers specifically, the vast

---

[9]     As an illustration, the providers' counsel and Ben Lynam, the chief actuary for Molina's parent company, conducted an impromptu negotiation during Lynam's trial testimony. Counsel asked Lynam: "Are you willing to sign us up at 80 percent of our billed charges?" Lynam stated, "I'm ready to sign you up at 150 percent of Medicare." Counsel responded, "No, sir. We don't work for pennies, sir."

majority of claims arising during the three-year time period at issue in this case were "directly paid under a contract." Bristow testified that TeamHealth has accepted lower reimbursement rates in exchange for the benefits that arise from being "in network" with an insurance company, such as patient satisfaction and certainty about the rate the doctor groups will be paid. He stated that TeamHealth does not deliberately try to prevent its doctor groups from "going in network," and he has negotiated in-network contracts with HMOs that offer ACA plans, like Molina does.

The record contains an email exchange between Mark Kline, a TeamHealth vice president, John McGuinness, Molina's former chief operating officer and vice president of network strategy, and Anthony Tyms, Molina's director of contracting. In December 2017, Kline emailed McGuinness and Tyms and stated:

> [T]hank you for sharing your template contract language as a starting point. As I mentioned on the call, it probably makes the most sense to come to agreement on fee schedules/reimbursement rates before spending a lot of time negotiating contract language. To that end, I am proposing a three year deal @ 325% of current Medicare, effective February 1, 2018 for 1 year, with a 5% escalator each year for the next two years (effective 2/1/19 and 2/1/20, respectively).
>
> Please let me know if you would like to discuss any aspect of this proposal. Once we agree on rates, we will plan to move forward with review and negotiation of contract language.

Several days later, McGuinness responded. He stated:

> The rate as presented is well above any contract we have in place with like providers for this line of business. For Molina our HIX product [ACA plans] is an extension of our Medicaid line of business, affording Molina the opportunity to retain members who may lose coverage

under Medicaid. I can offer 130% of Current Year Medicare for 2018 with a 5% inflator for 2019 and 2020.

Bristow testified that over the course of a year, his department at TeamHealth tried to negotiate an in-network contract for the providers with Molina. Molina's "final offer was just a little above what they had been paying [the providers], just a little over the Medicare rates." The reimbursement rates proposed by Molina were "a fraction" of what similar-sized health plans were paying out-of-network emergency care providers.[10] "[A]t the end of the day," Molina and the providers were "too far apart" to reach a contractual agreement, with Bristow characterizing Molina as being unwilling "to move to what we thought was an appropriate and reasonable [reimbursement] level."

Molina asked Bristow about the emails between Kline and McGuinness. Bristow testified that TeamHealth was willing to discount its preferred reimbursement rate of 900% of Medicare to 325% of Medicare "to see if we could get in network with this health plan at these rates." TeamHealth was not willing to consider a lower reimbursement rate. With respect to Molina's proposed reimbursement rate, this amount "was not close to where we had been pursuing Molina for over a year and trying to negotiate." Bristow testified that Molina "had

---

[10]  Specifically, Bristow testified that Molina paid "about 10 to 11 percent of [the providers'] charges," but other similarly situated health plans were paying between "75 and a hundred percent of [the providers'] charges." Bristow agreed with Emergency Services' counsel that Molina's reimbursement rates were "the lowest."

barely moved on their offer relative to what they had been paying us and what they had been talking with us before," and this proposed rate was "well below what we contracted with other health plans in the market."

The evidence at trial therefore reflected that although the providers and Molina attempted to negotiate a contract, they were unable to agree on the reimbursement rate. This is an essential term of a contract between an emergency care provider and a health insurance company, perhaps even the most important term. *See Vizant Techs.*, 576 S.W.3d at 368–69 ("An agreement's essential terms are those that parties would reasonably regard as vitally important ingredients of their bargain.") (quotations and alteration omitted). As Bristow testified, negotiating contracts and becoming "in network" with an insurance company brings certainty to the parties' relationship. When a contract governs the relationship between an emergency care provider and an insurance company, the provider "know[s] we're going to get paid and when we're going to get paid. We know the rate that we're going to get paid." The benefits of being "in network" can motivate a provider to accept a lower reimbursement rate for its services. Here, however, although the parties tried to negotiate a contract, they were unsuccessful because they could not agree on the reimbursement rate, or the "price" of the contract. The parties' negotiating history therefore does not support a conclusion that the parties had a

33

meeting of the minds about the amount to be paid to the providers for emergency services rendered to Molina's insureds.

Bristow also specifically testified about the providers' implied-in-fact contract claim. Bristow agreed with Molina's counsel that "there's obviously no written contract between these companies" and "there is no place that someone could go if they wanted to know what the terms of this contract were to be memorialized." He further agreed that the providers were not alleging that they had an oral agreement with Molina covering reimbursement rates.

However, Bristow testified that he believed the providers and Molina had an implied contract, with the "evidence of coverage that the Molina members have that covers emergency medicine services" acting as the basis for the implied contract. Molina's counsel and Bristow had a lengthy exchange concerning this theory, with Bristow repeatedly referring to the providers' statutory obligation to treat all patients who presented at their facilities in need of stabilizing emergency care, and Molina's corresponding statutory obligation to reimburse the providers. For example, Bristow testified:

> Q. It takes two to agree to a contract, right? Molina has to agree to this contract, correct?
>
> A. The implied-in-fact contract—
>
> Q. Yes or no? Two have to agree to the contract?
>
> A. Yes. And that—they did that through their evidence of coverage.

. . . .

Q. Now, the facts—I want to make sure I understand and that we're talking about the same thing. The law requires hospitals to treat patients when they come in, correct, when they come into the emergency department?

A. But, also, our physician providers as well.

Q. Well, let's say that's the case. I'm not going to argue with you. The physicians have to treat Molina's members. The [federal] law, EMTALA, requires them to do that, right?

A. Yes.

Q. Okay. A separate law, 1271.155, which the jury's all seen in opening statements, compels Molina to reimburse at the usual and customary rate, correct?

A. Yes.

Q. Okay. And your evidence that "We agreed to enter into a contract with you" is based solely and exclusively on the fact that you [the providers] are compelled by law to treat patients and we [Molina] are compelled by law to pay the usual and customary rate. And by that, you say, "Ha. Now we've agreed to a contract that you're bound to, and you've got to pay billed charges." That's your contract claim, right?

A. No. That's not the sole reason, I believe, that there's an implied-in-fact contract. It goes way beyond that, and the fact—

. . . .

Q. Did Molina ever express to you orally that it was willing to pay your billed charges?

A. They never—I never heard them verbalize that, no.

Q. In fact, they verbalized the exact opposite of that when Mr. McGuinness told Mr. Kline that that amount is far in excess of what they pay, even the 325, right? You don't dispute that Molina told you that?

A. No.

35

Q. Okay. Was there ever a time when Molina paid a higher amount in order to get you to treat these patients, and then they pulled the rug out from underneath you and cut the reimbursement rate and started paying you less?

A. No.

Q. They have always paid the same amount, right?

A. I think effectively, yes.

The providers argue on appeal that their implied agreement with Molina is sufficiently definite to be enforceable because Molina's payment for the providers' services is determinable by an "external standard": Insurance Code section 1271.155(a), which requires reimbursement for emergency care services by non-network physicians and providers to be at the "usual and customary rate or at an agreed rate." *See* TEX. INS. CODE § 1271.155(a); *see Penwell*, 724 S.W.2d at 905 (stating—in case in which parties allegedly agreed in oral contract that purchase price of property would be "that value given the property by an appraiser"—that "[w]hen an agreement provides a standard to be applied in determining price, the contract is sufficiently definite to be enforceable."). The providers further argue that Molina admitted at trial that it "agreed to pay [the providers] at the usual and customary rate," and they point to Bristow's testimony.

We do not agree with the providers that Bristow's testimony is some evidence of an implied agreement between the parties. Molina has never denied, nor could it credibly do so, that section 1271.155(a) requires it to reimburse non-network

physicians and providers for emergency care at the "usual and customary rate or at an agreed rate." *See* TEX. INS. CODE § 1271.155(a). But that is an obligation imposed by the Texas Legislature. Just as state and federal law requires the providers to provide stabilizing emergency care to any patient who presents at their facilities, regardless of the patient's insurance status or ability to pay, the Insurance Code requires Molina, as an HMO, to reimburse non-network emergency care providers at the "usual and customary rate or at an agreed rate." *See id.* Molina acknowledging that this is a statutory obligation imposed upon it as an HMO doing business in Texas does not transform this obligation into the basis for an implied contract claim. Holding otherwise—and concluding that the respective statutory obligations of the parties suffice to establish a "meeting of the minds" that can support a cause of action for breach of an implied contract—would mean that *every* HMO operating in Texas has an implied contract with *every* out-of-network provider that renders emergency care to the insurance company's insureds in Texas.

The providers and Molina tried to reach an express contract to bring the providers into Molina's network, but they were unsuccessful because they could not agree on the reimbursement rate, an essential term of such an agreement. Their relationship thus remained governed by various federal and state statutory obligations. Section 1271.155(a) requires Molina to reimburse out-of-network providers at the "usual and customary rate," but the statute provides no guidance on

what constitutes such a rate. There is no evidence in the record that the providers and Molina ever agreed on what a "usual and customary" reimbursement rate might be. In fact, the evidence is to the contrary: that they disagreed on this point throughout the trial proceedings.

We conclude that the providers produced no evidence of a meeting of the minds between them and Molina sufficient to form an implied contract. *See Bustamante*, 529 S.W.3d at 455–56 (stating that evidence is legally insufficient to support jury finding when record discloses complete absence of evidence of vital fact); *E-Learning*, 517 S.W.3d at 858 ("A meeting of the minds is implied from and evidenced by the parties' conduct and course of dealing."). Because the providers did not present legally sufficient evidence to support an essential element of a claim for breach of an implied contract, we hold that the trial court erred by denying Molina's motion for directed verdict on this claim and submitting this claim to the jury. *See Plotkin*, 304 S.W.3d at 476 (requiring meeting of minds as essential element of express or implied contract); *see also Alanis v. US Bank Nat'l Ass'n*, 489 S.W.3d 485, 503 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (stating that directed verdict is proper when "the evidence offered on a cause of action is insufficient to raise an issue of fact").

We sustain Molina's fourth issue.[11]

## Conclusion

We reverse the judgment of the trial court and render judgment that the providers take nothing on their claims against Molina.


April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.

---

[11] Because we sustain Molina's fourth issue and conclude that legally sufficient evidence did not support the providers' claim for breach of an implied contract—the providers' only claim remaining after the Texas Supreme Court's decision in *Texas Medicine Resources*—we need not address Molina's fifth issue concerning the propriety of the trial court's award of attorney's fees because the providers no longer prevail on any of their causes of action. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483–84 (Tex. 2019) (stating that generally, in Texas, each party must pay their own attorney's fees, although prevailing party may recover fees from opposing party when authorized by statute or by contract).